## THE STATE ex rel. JOHN H. POLLOCK v. CHARLES U. BECKER, Secretary of State.

### In Banc, August 1, 1921.

1. **LEGISLATIVE ENACTMENT**: Referendum: Power of Legislature to Prevent. The General Assembly cannot prevent the reference of a legislative act to the people by referendum petition for their approval or rejection, by inserting in the act a section that the enactment is necessary for the immediate preservation of the public peace, health and safety, when it is not such in fact, nor by inserting such words in the act inhibit the court from determining whether it is subject to reference. [Per WOODSON, J.; JAMES T. BLAIR, C. J., and WALKER, GRAVES and ELDER, JJ., concurring; HIGBEE AND DAVID E. BLAIR, JJ., dissenting.]

2. **CONSTITUTIONAL PROVISION**: Adopted from Another State: Interpretation Also Adopted: Exception. The general rule, general in that it is the frequent expression of the courts, is that where a statute or constitutional provision has been borrowed from another state, which prior to its adoption in the borrowing state had received a construction by the highest court of that state, the presumption is that the borrowing state adopted it in the light of

State ex rel. Pollock v. Becker.

such construction; but this is only a rule of constructon, and there are exceptions to it as ancient as the rule itself, one of which is that where the courts of the adoptng state are clearly of the opinion that the construction by the courts of the initial state is erroneous, or that its application would lead to a denial of a substantial right, such foreign construction will not be controlling. [Per GRAVES, J.; BLAIR, C. J., and WALKER, J., concurring.]

3. REFERENDUM: Ousting Justice of Peace. A legislative act which removes eight justices of the peace in one city, cuts down the number of justices and constables and provides for the appointment of others by the Governor, is not a bill for the immediate preservation of the public peace, health or safety, nor, as is shown by current history, of which the courts take judicial notice, were they enacted for any such purpose. And it is against all reason that the reference of such acts to the people can be prevented by inserting in them a section declaring that their enactment is necessary for the immediate preservation of the public peace, health and safety. [Per GRAVES, J.; BLAIR, C. J., and WALKER, J., concurring.]

4. ————: Exception: Exercise of Police Power: Judicial Question. The clause of the Constitution which does not require a reference of legislative acts necessary for the immediate preservation of the public peace, health or safety is an exception to the otherwise universal reservation by the people of the power of referendum, and includes only those certain, definite and unquestioned phases of the police power which, in their very nature, may be and usually are emergent; and as the courts exercise jurisdiction to determine whether a legislative act is a valid exercise of the police power, it is also a judicial question whether a certain act, which attempts to cut off its reference to the people, is a valid exercise of the police power. [Per BLAIR, C. J.; WALKER and GRAVES, JJ., concurring.]

5. ————: Legislative Finding: Conclusiveness. The Constitution does not say that a legislative act shall be exempt from the referendum if the General Assembly shall declare it to be necessary for the immediate preservation of the public peace, health or safety, but the exemption is made to depend on the fact that the act is so necessary. [Per BLAIR, C. J.; WALKER and GRAVES, JJ., concurring.]

6. ————: Exercise of Police Power: Judicial Question: Legislative Finding. The question of fact whether a trade or calling is of such a nature as to render it subject to regulation or to particular regulations under the police power, is strictly a judicial question; and the court will hold invalid any legislative act which it finds

does not touch the public good in such a way as to justify regulation of the calling or the particular regulation attempted, and it will do that in the face of the fact that the regulatory act involves a legislative finding that existing facts justify the attempted regulation. [Per BLAIR, C. J.; WALKER and GRAVES, JJ., concurring.]

7. ———: Widening Police Power: Conclusiveness of Legislative Finding. If a declaration in a legislative act that it is necessary for the immediate preservation of the public peace, health and safety is conclusive upon the courts, then the result is that Section 57 of Article IV of the Constitution empowers the Legislature to widen and extend the police power to include callings and regulations to which it could not have been extended prior to the adoption of said section, and to remove from the realm of judicial inquiry every question of fact pertaining to the scope and extent of a proper exercise of the police power; and, furthermore, it empowered the Legislature to defeat the reference of any and all bills, whether an attempted exercise of the police power or otherwise, by the mere inclusion of such a declaration in the bill, however false in fact it may be. [Per BLAIR, C. J.; WALKER and GRAVES, JJ., concurring.]

8. ———: Legislative Error: Corrected by Another Error. That part of said Section 57 pertaining to the reference to the people of laws enacted by the Legislature was designed to correct legislative errors; and if the Legislature errs by passing a bad act, it cannot cure that error by adding thereto another error, false on its face, that the act is necessary for the immediate preservation of the public peace, health and safety. [Per BLAIR, C. J.; WALKER and GRAVES, JJ., concurring.]

9. ———: Legislative Finding: Effect Upon Referendum and Courts. If a legislative declaration inserted in a law that its enactment is necessary for the immediate preservation of the public peace, health and safety is conclusive upon the question of its referendum and prevents its reference to the people, it would likewise be conclusive upon the courts when they are called upon to consider the validity of the act as a proper and reasonable exercise of the police power. It is conclusive neither on the referendum nor upon the court. [Per BLAIR, C. J.; WALKER and GRAVES, JJ., concurring.]

10. ———: Police Regulation: Question of Fact. Courts have power to pass upon questions of fact in determining whether police regulations are valid or invalid. [Per BLAIR, C. J.; WALKER and GRAVES, JJ., concurring.]

11. ————: Adopted from Oregon: Prior Construction. The fact that the referendum provision of our Constitution was borrowed from Oregon, and that the highest court of that state had decided, before it was adopted here, that a declaration inserted by the Legislature in an act declaring that the enactment is necessary for the immediate preservation of the public peace, health and safety is conclusive upon the courts and prevents the reference of the act to the people by petitions sufficiently signed, will not compel the acceptance of such construction by the courts of this State, because it is not in harmony with the spirit and purpose of our Constitution as declared in the initiative and referendum provision, and in such case the rule of foreign construction does not apply. The construction of the borrowed constitutional provision by the courts of the initial state is not binding, but only persuasive, and will not be followed where the courts of the adopting state are clearly of the opinion, as the Supreme Court is in this case, that such construction was erroneous and if followed will result in the denial of a substantial right. [Per WALKER, J.; BLAIR C. J., and GRAVES, J., concurring.]

12. ————: Purpose: Legislative Defeat. The purpose of the referendum provision, expressed in an adopted constitutional amendment, was to provide an efficient method of checking and regulating legislative power, by providing that all legislative acts, except those necessary for the immediate preservation of the public peace, health and safety, may be referred to the people for their approval or rejection; and to hold that the Legislature may, in spite of the clear language used, determine, not only the extent to which the reserved power shall be used, but whether it may be exercised at all, would be to rule that the Legislature can violate the spirit of the provision and destroy its purpose. [Per WALKER, J.; BLAIR, C. J., and GRAVES, J., concurring.]

13. ————: ————: ————: Justice of Peace: Unlimited Exceptions. If the Legislature may except from the operation of the referendum provisions of the Constitution acts abolishing justices of the peace, clerks and constables in designated townships and providing for the appointment of their successors, by simply declaring in the acts that their enactment is necessary for the immediate preservation of the public peace, health and safety, then a like exception may be effected by inserting said declaration in any act, regardless of the absurdity of its application, and thus the constitutional power intended to be reserved will be completely destroyed. [Per WALKER, J.; BLAIR, C. J., and GRAVES, J., concurring.]

14. ————: Justice of Peace: Public Peace, Health and Safety: Immediate Preservation: Absurdity. Acts which apply to only one

city in the State cannot be said to be "public" in the sense that word is used in the referendum clause of the Constitution; and if their purpose, as is apparent from their face, is to effect a change in the personnel in the offices of justices of the peace, clerks and constables in the townships of said city, and to define their duties and powers, it would be to violate reason, which is the life of the law, and to uphold an absurdity, to say they are necessary for the "immediate preservation" of the public peace, or the public health or the public safety, for those words imply an imminent danger, an impelling necessity, public disorders, and an unwholesome sanitary condition of the community at large. [Per WALKER, J.; BLAIR C. J., and GRAVES, J., concurring.]

15. ———: Legislative Acts: Presumption of Right Action: Invasion: Judicial Interference. Every intendment should be made in favor of the propriety of legislative action; but it is firmly fixed in American government that it is the province and duty of the judicial department to say what the law is, and that duty is more imperative under modern constitutions which do not invest exclusive legislature power in the legislature, but divide it between the legislature and the people, and place upon the court, in a proper case, the duty to determine whether the legislature's acts constitute an invasion upon the powers which the people in their Constitution have reserved to themselves. If a legislative act purports to be for the preservation of the public peace, health and safety, and its words and subject-matter have no relation to those subjects, and an analysis of it demonstrates that it is a palpable invasion of the powers reserved by the people, the courts will so decide, and preserve the constitutional right of referendum. [Per WALKER, J.; BLAIR, C. J., and GRAVES, J., concurring.]

16. ———: Peace and Safety: Legislative Determination. The mandate of the Constitution, coming directly from the people, is superior to the will of the Legislature; and while the Legislature, being invested with law-making power, must, in the first instance, decide whether an act is necessary for the immediate preservation of the public peace, health or safety, its determination that the necessity exists if in fact without substantial basis, is not final or conclusive. But if the act purports to have been adapted to meet an emergency which palpably, from its face, does not exist, it becomes the duty of the courts to take jurisdiction and give effect to the constitutional intent and purpose. [Per ELDER, J.; BLAIR, C. J., and WALKER, and GRAVES, JJ., concurring.]

17. ———: ———: ———: Construction by Oregon Court. The ruling of the Supreme Court of Oregon, from which the initiative and referendum section of our Constitution was borrowed, that a decla-

State ex rel. Pollock v. Becker.

ration placed in a bill by the Legislature that its enactment is necessary for the immediate preservation of the public peace, health and safety is conclusive, is not binding upon the Supreme Court of this State, although such ruling was made before the constitutional section was adopted in this State. While such foreign construction is persuasive and entitled to respectful consideration, it is not binding, and will not be followed if the courts of the adopting state are of the opinion that it is erroneous. [Per ELDER, J.; BLAIR, C. J., and WALKER and GRAVES, JJ., concurring.]

18. ——: ——: ——: **Removal of Justice of Peace.** A declaration in a legislative act, abolishing in one township the offices of eight justices of the peace and constables, who from the record are presumed to be properly and efficiently discharging their official duties, and providing for the immediate appointment of other justices and constables, that its enactment is necessary for the immediate preservation of the public peace, health and safety, is not conclusive on the courts, and is not sufficient to prevent the reference of said act to the people for their approval or rejection. [Per ELDER, J.; BLAIR, C. J., and WALKER and GRAVES, JJ., concurring.]

19. ——: ——: ——: **Construction by Oregon Court: Binding.** When the people of Missouri adopted the referendum amendment from the Constitution of Oregon they adopted the construction which had previously been given it by the Supreme Court of that state just the same as if that construction had been written into the body of the amendment; and that court having ruled, prior to the adoption of the amendment in this State, that a declaraion written into the body of a legislative act that its enactment is necessary for the immediate preservation of the public peace, health and safety is conclusive and final on the question of necessity, such ruling is binding on the courts of this State and compel a like ruling from them. [Per HIGBEE, J., dissenting.]

20. ——: ——: ——: **Legislative Power: Coordinate and Independent Department.** The Constitution has solemnly vested the legislative power in the General Assembly, which is an independent and co-ordinate department of the government, answerable only to the people for the execution of the powers delegated to it, and the remedy for any abuse of that power, by fraud or trickery, is the ballot. Besides, a legislative act, which contains a section declaring that its enactment is necessary for the immediate preservation of the public peace, health and safety, may be submitted to the direct vote of the people by an initiative petition, so that there is no foundation for the suggestion that the Legislature, by inserting such a declaration in an act, may, by fraud and trickery, destroy the

referendum or prevent legislation by the people. [Per HIGBEE, J., dissenting.]

21. ———: ———: ———: **Oregon Construction.** When one state borrows a constitutional provision from another and the highest court of that state has authoritatively construed the provision prior to its adoption by such other, such provision is to be held as having been adopted with the construction thus previously put upon it. The initiative and referendum amendment to the Missouri Constitution was borrowed from the Constitution of Oregon, and the decision of the Supreme Court of that State, made before its adoption here, that a declaration in an act of the Legislature that its enactment is necessary for the immediate preservation of the public peace, health and safety is final and conclusive on the court, if not absolutely binding on the Supreme Court of Missouri, is persuasive authority of the highest character. [Per DAVID E. BLAIR, J., dissenting.]

22. ———: ———: ———: **Weight of Authority: On Principle.** The decided weight of authority is to the effect that the existence of the necessity for a legislative act is a matter of legislative determination. But independent of decided cases, and on principle, the courts are and should be bound by the declaration in an act passed by the Legislature that its enactment is necessary for the immediate preservation of the public peace, health and safety. [Per DAVID E. BLAIR, J., dissenting.]

## Mandamus.

WRIT GRANTED.

*John T. Barker* and *John M. Atkinson* for relator.

The Secretary of State refused to accept these referendum petitions for the sole reason that Senate Bills Nos. 4, 5, 6, and 7 contained the "peace, health and safety clause." Relator contends that this action was arbitrary, and that this court must determine from the entire bills whether the peace, health and safety is involved. State ex rel. v. Sullivan, 224 S. W. 327; State ex rel. v. Roach, 230 Mo. 435; State ex rel. v. Meath, 84 Wash. 302; In Re Hoffman, 155 Cal. 114; McClure v. Nye, 22 Cal. App. 248; Rigdon v. San Diego, 30 Cal. App. 107; Riley v. Carico, 27 Okla. 33; Beal v. State, 103 Atl. (Mary-

land), 99; Attorney-General v. Lindsay, 178 Mich. 524; Simpson v. Gage, 195 Mich. 581; Payne v. Graham, 7 A. L. R. 516; Strange v. Levy, 107 Atl. (Maryland), 549; County 'v. Dayton, 92 Ohio St. 215; State ex rel. v. Whisman, 36 S. D. 260, L. R. A. 1917B, 1; Case v. Howell, 85 Wash. 281, 147 Pac. 1162; State ex rel. v. Wright, 251 Mo. 341; Mugler v. Kansas, 123 U. S. 623; O'Neil v. Amusement Co., 8 A. L. R. 1600; In re Jacobs, 98 N. Y. 981, 50 Am. Rep. 636.

*Jesse W. Barrett*, Attorney-General, *Merrill E. Otis* and *Albert Miller*, Assistant Attorneys-General, for respondent.

(1)  The initiative and referendum provision in the Constitution, Section 57 of Article IV, was taken bodily from the Constitution of Oregon. State ex rel. v. Carter, 257 Mo. 68, 70; State ex rel. v. Sullivan, 224 S. W. 334. (2)  The initiative and referendum amendment was adopted in Missouri at the November election in 1908. More than four years before, to-wit, on January 11, 1904, the Supreme Court of Oregon, in the case of Kadderly v. Portland, 44 Ore. 118, 75 Pac. 222, construed the Oregon provision as authorizing the Legislature finally and conclusively to determine whether a given act is necessary for the immediate preservation of the public peace, health and safety. Missouri, having taken its amendment from Oregon, took it with that interpretation, and that interpretation is now binding upon the Supreme Court of Missouri. State ex rel. v. Sullivan, 224 S. W. 342; State ex rel. v. Sullivan, 224 S. W. 334; State ex rel. v. Carter, 257 Mo. 69; State ex rel. v. Miles, 210 Mo. 146; Skouten v. Wood, 57 Mo. 380; Skrainka v. Allen, 76 Mo. 389; Knight v. Rawlings, 205 Mo. 433.  (3)  Under a constitutional provision excepting from the referendum laws necessary to the immediate preservation of the public peace, health or safety, it is for the Legislature to say what laws come within the exception, and its decision is final and conclusive.

Kadderly v. Portland, 44 Ore. 118, 75 Pac. 222; State ex rel. v. Bacon, 14 S. D. 394, 85 N. W. 225; Oklahoma City v. Shields, 22 Okla. 265, 100 Pac. 559; In re Menefee, 22 Okla. 365, 97 Pac. 1014; Arkansas Tax Commission v. Moore, 103 Ark. 48, 145 S. W. 199; Hanson v. Hodges, 109 Ark. 479, 160 S. W. 392; Van Kleek v. Ramer, 62 Colo. 4, 156 Pac. 1108; In re Senate Resolution, 54 Colo. 262, 130 Pac. 333; People ex rel. v. Ramer, 61 Colo. 422, 158 Pac. 146. (4) Whether an act is necessary for the preservation of the public peace, health and safety is a question of fact. The finding by the Legislature as to questions of fact is not subject to judicial review. State ex rel. v. Hackman, 275 Mo. 646; Ex parte Renfrow, 112 Mo. 591, 594. (5) Even if it should be held that the legislative finding is not conclusive, nevertheless it should be conclusive in all cases of doubt. Attorney-General v. Lindsay, 178 Mich. 524; State ex rel. v. Howell, 85 Wash. 281. (6) The phrase "immediate preservation" in the referendum provision refers merely to those laws which will be necessary before the time when the people under the referendum would have time to vote upon them. Hanson v. Hodges, 160 S. W. (Ark.) 392, 396. (7) The laws involved in this case are, as a matter of fact, necessary to the immediate preservation of the public peace, health and safety.

*Wilbur F. Spottswood* for *amicus curiae.*

(1) The Constitution (Secs. 1 and 57, Article IV), in vesting legislative power in the General Assembly, reserved to the people the right to subject to popular vote all laws, except certain classes of laws, among them the class of laws "necessary for the immediate preservation of the public peace, health or safety." (2) It is conceded that, to bring the law, now under consideration, within the exception, exempting certain classes of laws from the referendum, it must appear that it belongs to a class of laws which are necessary either for the imme-

diate preservation of the public peace or for the imme-
diate preservation of the public health, or for the imme-
diate preservation of the public safety. (3) From its
very nature the law in question belongs to the class of
laws which are necessary for the preservation of all
these public blessings. It creates a court of justice
having a certain measure both of civil and criminal ju-
risdiction, including jurisdiction in cases of nuisance; and
civilization knows of no scheme by which it can dispense
with its courts as instruments for the accomplishment
of those ends. Such laws are absolutely necessary.
(4) And not only is the law in question necessary for
the preservation of the peace, health, and safety of the
people, but it is immediately necessary for their pres-
ervation, since the menace to the peace, health and safe-
ty of the community, against which society, through its
courts, raises the shield and unsheaths the sword, is
always present, always immediate, always instant. Not
for a moment can an efficient judicial system be dis-
pensed with, if the public peace, health and safety are
to be preserved. (5) Some have supposed that the
court can consider previously existing conditions and
previously existing laws, in order to determine whether
the act now before the court is necessary; but it is sub-
mitted that such a conception is entirely erroneous.
Were the court to go into such matters, it would, for the
time being, lay aside its judicial character, and become,
for the nonce, a legislative body. Its judgment would
be forged in the heat of parliamentary debate, and would
rest upon conceptions, not of what the law was, but upon
conceptions of what the law ought to be. In short, we
would have an exhibition of the exercise by the judicial
branch of a function wholly legislative, contrary to the
entire scheme of government embodied in the Constitu-
tion. (6) What Section 57 of Article IV of the Consti-
tution does, is, not to provide that particular laws, made
necessary by particular conditions, shall be excepted
from the referendum, but that certain classes of laws
shall be so excepted; and the only function of the court

is, to determine whether the law, from its nature, falls within one of those classes. That this law does fall within the class of laws necessary for the immediate preservation of the public peace, the public health and the public safety, we have already shown.

WOODSON, J.—This is an original proceeding by mandamus instituted in this court by the relator against the respondent, the Secretary of State, seeking to compel him to accept and file four certain referendum petitions, hereinafter to be more fully described, so that the laws mentioned in the petitions may be placed upon the ballots at the next general election of the State for confirmation or rejection by the voters of the State.

The pleadings in the case fully and clearly present the legal proposition presented to this court for determination and for that reason I shall here present them in full. They are as follows:

### PETITION.

"This action was brought in the name of the State of Missouri at the relation of John H. Pollock against Charles U. Becker, Secretary of State. The petition, which was filed in this court on the 18th day of June, 1921, alleges that the relator is a resident and citizen of Kansas City, Jackson County, Missouri, and a legal voter and qualified elector in said city, county and State, and at the November election in 1918 was elected justice of the peace within and for Kaw Township in said county and State for a term of four years, and that the respondent Becker is now the duly elected and acting Secretary of State of the State of Missouri; that the 51st General Assembly convened at Jefferson City, January 1, 1921, and adjourned *sine die* on March 21, 1921, and passed, among others, Senate Bill No. 4, entitled, 'An Act to amend Section 2688 of the Revised Statutes of Missouri, 1919, relating to Justices of the Peace, abolishing the offices of Justices of the Peace, elected in dis-

tricts and certain townships and providing for the transfer of business pending before such Justices;' and Senate Bill No. 5, entitled, 'An Act repealing Article 9 including Sections 2923 to 2943 inclusive, Chapter 22 of the Revised Statutes of Missouri, 1919, entitled ''Justices and constables in townships of two hundred thousand and less than four hundred thousand''—and making a new article in lieu thereof;' and Senator Bill No. 6 entitled, 'An Act to amend Section 2689 of the Revised Statutes of Missouri, 1919, relating to Justices of the Peace;' and Senate Bill No. 7, entitled, 'An Act amending Section 2143 of the Revised Statutes of Missouri, 1919, relating to constables, abolishing the office of constable in districts, in certain townships, and providing for constables in such townships;' that all four of said bills have a common interest and pertain to the same subject and affect the same parties, that is, said bills abolish the offices of eight justices of the peace and all constables and clerks in Kaw Township, Jackson County, Missouri; Senate Bill No. 4 provides that on the 1st day of July, 1921, the offices of the justices of the peace elected or appointed in districts in all municipal townships containing a city of one hundred thousand inhabitants and less than three hundred thousand inhabitants and the office of clerks to such justices shall be abolished and all jurisdiction and powers vested in such justices of the peace are vested in other justices of the peace provided for in said bill; Senate Bill No. 5 provides for the election of five justices of the peace in such township at the general election in 1922, and provides that until such election the Governor shall appoint and confer jurisdiction upon such new justices of the peace to make certain rules, etc.; Senate Bill No. 6 provides for the appointment of other justices of the peace by the County Court of Jackson County; Senate Bill No. 7 abolishes all of the constables holding office after the first day of July, 1921 in said Kaw Township, Jackson County, Missouri, and provides for the election of new constables at the general election in 1922 and authorizes the Governor to appoint until such general election.

"The petition of relator further alleges that all of said bills were approved by the Governor of Missouri on the 11th day of March, 1921, and that on the 18th day of June, 1921, and within ninety days after the adjournment of the Fifty-first General Assembly, the relator presented to the Secretary of State in the presence of the Governor, 1538 legal referendum petitions containing the total of 65,248 names of legal voters and qualified electors of the State of Missouri, which petitions were legally signed by more than five per cent of the legal voters and qualified electors in more than two-thirds of the Congressional districts of the State of Missouri, asking for a referendum on all four of said Senate Bills in order that the people might at the general election in 1922 vote for the appproval or rejection of said measures; that said Secretary of State, wholly disregarding his duties and without any legal right or authority, refused to accept, receive and file said referendum petitions against said bills and assigned as his sole and only reason for such refusal that said bills were not referable, because each of the bills contained among other provisions the following language:

"'This enactment is hereby declared to be necessary for the immediate preservation of the public peace, health and safety within the meaning of Section 57, Article 4, of the Constitution of Missouri.'

"The petition further alleges that it is not true that said bills, or either of them, are necessary for the immediate preservation of the public peace, health or safety within the meaning of Section 57 of Article 4 of the Constitution of Missouri, but that said bills are purely local in their character and pertain to Jackson County, Missouri, only, and that such statements contained in said bills are false and untrue and that such an attempt on the part of the Legislature to prevent said bills from being referred to the people is unconstitutional and void and in violation of Section 57 of Article 4 of the Constitution of Missouri, and that such action on the part of the Secretary of State was and is arbitrary

and·unfair; that by the refusal of the respondent to accept, receive and file such referendum petitions, the relator and all other citizens of Missouri have suffered and will suffer irreparable wrong and injury and the people of the State will be denied their constitutional right to vote for the approval or rejection of said measures and will be entirely without redress of said wrongs, without the interposition and interference of this court oy its writ of mandamus.

"The prayer of the petition prays this court to issue its writ of mandamus, directing and commanding respondent, as Secretary of State, to forthwith accept, receive and file in his office at Jefferson City, Missouri, all of the said referendum petitions pertaining to said Senate Bills Nos. 4, 5, 6, and 7, and to detach the sheet containing the signatures and affidavits and cause them to be attached to one or more printed copies of the measures so proposed, and to deliver such detached copies of such measures to the relator, and that the respondent be compelled to forthwith transmit to the Attorney-General of the State of Missouri a copy thereof in order that said Attorney-General shall provide and return to the Secretary of State a ballot title for said measures, and that said respondent be compelled to furnish to each of the county clerks of the State of Missouri a certified copy of the ballot title and numbers of the several measures to be voted upon at the coming general election, and for such other relief as may be found necessary and expedient to cause the respondent to do that which in justice and right ought to be done.

"After the filing of the petition in this court, relator and respondent entered into a stipulation agreeing that the petition might stand for the alternative writ; that the respondent have until the 28th day of June, 1921, within which to plead; that the cause be submitted to the court upon briefs filed by both parties; that relator. have until the 5th day of July, 1921, to file his brief and that respondent have five days thereafter to file his answer brief, and that relator have three days

289 Mo.—43

thereafter if desired to file reply brief; and that Senate Bills Nos. 4, 5, 6, and 7, be consolidated in one action and all questions as to joinder be waived.''

ANSWER.

''On the 28th day of June, 1921, respondent filed his answer to said petition of mandamus and in said answer says:

''Admits that relator is a resident and assessed tax-paying citizen of Kansas City, Jackson County, Missouri, and is a legal voter and qualified elector in said city, county and state, and was on the second day of November, 1918, elected a justice of the peace within and for Kaw Township, Jackson County, Missouri, for a term of four years; admits that respondent is and has been the Secretary of State of Missouri since the 10th day of January, 1921; admits that Fifty-first General Assembly of Missouri convened at Jefferson City on January 5, 1921, and adjourned *sine die* on the 21st day of March, 1921, and passed, among other acts, Senate Bills Nos. 4, 5, 6, and 7, with the titles as pleaded; alleges that copies of said Senate Bills Nos. 4, 5, 6, and 7, are attached and marked 'Exhibits A, B, C and D,' and made a part thereof; admits that all four of said bills have a community of interest, that is, said bills are similar, affect the same parties, pertain to the same subject, are companion bills, and one is useless without all; admits that all of said bills were approved by the Govenor on the 11th day of March, 1921, and that on the 18th day of June, 1921, in the office of the Secretary of State and in the presence of respondent and the Govenor of Missouri, relator presented as against each of said bills 1538 referendum petitions containing a total of 65,248 names of legal voters and qualified electors of the State of Missouri, which said petitions were legally signed by more than five per cent of the legal voters and qualified electors in each of two-thirds of the Congressional districts of the State of Missouri as set out in detail in relator's petition; admits that said petitions were presented in

order that said Senate Bills Nos. 4, 5, 6, and 7, might be referred to the people of Missouri for their approval or rejection; admits that at the time said referendum petitions were presented, relator demanded respondent to accept, receive and file said petitions against each of said bills and to detach the sheets containing the signatures and affidavits as alleged in relator's petition, and demanded that respondent forthwith transmit to the Attorney-General of the State of Missouri a copy thereof in order that he might provide a ballot title for each of said measures, and demanded that respondent furnish to each of the county clerks of the State of Missouri a certified copy of the ballot titles and numbers of the several measures to be voted upon at the coming general election, and demanded that respondent fully comply with Chapter 47 of the Revised Statutes of Missouri 1919, and other laws appertaining to the referendum acts of the Legislature; and admits that respondent refused to accept, receive and file said referendum petitions against each and all of said bills; denies that in refusing to accept, receive and file said petitions, respondent wholly disregarded his duties as Secretary of State; admits that each of said bills contained among other provisions, the following language:

" 'This enactment is hereby declared necessary for the immediate preservation of the public peace, health and safety, within the meaning of Section 57 of Article 4 of the Constitution of Missouri.'

'Denies that it is not true that said bills, or either of them, are necessary for the immediate preservation of the public peace, health and safety within the meaning of Section 57 of Article 4 of the Constitution of Missouri; denies that said bills, and each of them are purely local in their character and pertain to Jackson County only and do not affect the citizenship of Missouri in any particular; denies that the statement contained in each of said bills is false and untrue, and denies that such statement does not prevent said bills from being referred to the people for their approval or rejection, and that

the action of the Legislature in inserting said statements in said bills was unconstitutional and void and in violation of Section 57 of Article 4 of the Constitution of Missouri; and denies that the action of respondent, as Secretary of State, was and is arbitrary, unfair and in violation of Section 57 of Article 4 of the Constitution of Missouri, or with any other provision of the Constitution; denies that by his refusal to accept, receive and file such referendum petitions the relator and other citizens of Missouri have suffered, and will suffer, irreparable wrong and injury and the people of the State be denied any constitutional right whatsoever by reason of his said action; denies each and every allegation contained in relator's petition and alternative writ of mandamus not herein expressly admitted; further answering, respondent states that he refused, and still refuses, to accept, receive and file the referendum petitions tendered by the relator for the following reasons:

"1. That said Senate Bills Nos. 4, 5, 6 and 7, and each of them, contain the following language:

" 'This enactment is hereby declared to be necessary for the immediate preservation of the public peace, health and safety, within the meaning of Section 57, of Article 4, of the Constitution of Missouri.' .

"Alleges that by reason of said legislative declaration contained in each of said bills and by reason of the provisions of Section 57 of Article 4 of the Constitution of Missouri, said bills are not subject to, but are excepted from, the referendum.

"2. That said bills, and each of them, are necessary for the immediate preservation of the public peace, health and safety, and that, therefore, by the provisions of Section 57 of Article 4 of the Constitution of Missouri, said bills are not subject to the referendum; and alleges that, having made return fully to the relator's petition and the alternative writ of mandamus herein, respondent prays the court that the peremptory writ of mandamus prayed for by relator be denied."

REPLY.

"On the 30th day of June, 1921, relator filed his reply to the answer of the respondent as follows:

"Admits that said Senate Bills Nos. 4, 5, 6 and 7, and each of them, contained the following language:

" 'This enactment is hereby declared to be necessary for the immediate preservation of the public peace, health and safety within the meaning of Section 57 of Article 4 of the Constitution of Missouri.'

"Denies that by reason of said legislative declaration contained in each of said bills and by reason of the provisions of Section 57 of Article 4 of the Constitution of Missouri, said bills are not subject to, but are excepted from, the referendum; denies that said bills, and each of them, are necessary for the immediate preservation of the public peace, health and safety, and therefore, by the provisions of Section 57 of Article 4 of the Constitution of Missouri, said bills are not subject to the referendum; further alleges that said statement in each of said bills is false and untrue and in violation of Section 57 of Article 4 of the Constitution of Missouri and that said bills are not excepted from the referendum by reason of said statement; and further alleges that it is not true that said bills, or either of them, are necessary for the immediate preservation of the public peace, health and safety and alleges that said bills are purely local in their character and simply provide for legislating out of office eight justices of the peace and eight constables in one township (Kaw) in the entire State of Missouri, and that the bills are not in any sense necessary for the immediate preservation of the public peace, health and safety.

"We submit, therefore, that there is simply one question for this court to determine and that is whether or not the adoption by the Legislature of the 'peace, health and safety clause' excepts these bills from the referendum. That is; may a Legislature select only one township in the entire State of Missouri and legislate

out of office eight justices of the peace and constables who have been elected for a four-year term and authorize the Governor to appoint their successors until the next general election? By stipulation filed and the pleadings, all other questions are eliminated, and the court is called upon to determine the one legal question involved.''

There is but a single legal proposition presented by this record to this court for determination, and that is, has the Legislature of the State the constitutional authority under Section 57 of Article 4 of the Constitution to enact a law, and debar the power of the courts of the State from passing upon the question as to whether or not the law is subject to referendum by adding thereto the words: ''This enactment is hereby declared to be necessary for the immediate preservation of the public peace, health, and safety, within the meaning of Section 57 of Article 4 of the Constitution of Missouri?'' Said section, in so far as here necessary, reads as follows:

''The legislative authority of the State shall be vested in a legislative assembly, consisting of a senate and house of representatives, but the people reserve to themselves power to propose laws and amendments to the Constitution, and to enact or reject the same at the polls, independent of the legislative assembly, and also reserve power at their own option to approve or reject at the polls any act of the legislative assembly. The first power reserved by the people is the initiative, and not more than eight per cent of the legal voters in each of at least two-thirds of the Congressional districts in the State shall be required to propose any measure by such petition and every such petition shall include the full text of the measure so proposed. Initiative petitions shall be filed with the Secretary of State not less than four months before the election at which they are to be voted upon. The second power is the referendum, and it may be ordered (except as to laws necessary for the immediate preservation of the public peace, health or safety and laws making appropriations for the current expenses

of the State government, for the maintenance of the
State institutions and for the support of public schools)
either by the petitions signed by five per cent of the
legal voters in each of at least two-thirds of the Con-
gressional districts in the State, or by the legislative
assembly, as other bills are enacted.''

This question has been most elaborately and ably
discussed by counsel for the respective parties, and all
the authorities bearing upon the question from the
various states of the Union have been cited, and after a
thorough consideration of the same, I am fully satisfied
that the law of the case was, and is, fully and correctly
declared by GRAVES, J., in the case of State ex rel. v.
Sullivan, 283 Mo. 547, 224 S. W. 327, where the same
legal proposition was presented to this court for deter-
mination that is here presented by this case. I fully con-
curred in the views as there expressed by Judge GRAVES,
and adopt them as my views of the law of this case.
While that opinion was not concurred in by a unanimous
opinion of the court, yet there was but one dissent as to
the law as there expressed regarding the question here
presented; Judges WILLIAMSON, GOODE, BLAIR, and WIL-
LIAMS concurred as to paragraphs 1, 2, 3, 4, 6 and the
result of the GRAVES opinion, but they expressed no
opinion as to Paragraph 5.

For the reasons stated, I am of the opinion that
the writ of mandamus should be made permanent. It is
so ordered. *James T. Blair, C. J., Graves, Walker* and
*Elder, JJ.,* concur in separate opinions; *Higbee* and
*David E. Blair, JJ.,* dissent in separate opinions.

GRAVES, J. (concurring).—I concur in the law an-
nounced by our brother WOODSON in this case. He adopts
what the writer said in Paragraph Five of the opinion in
the case of State ex rel. Westhues et al. v. Sullivan, 283
Mo. 1. c. 584, et seq. We there ruled, upon what appeared
to us to be the weight of authority and the very reason
of the matter, that the Legislature, under Section 57 of
Article IV of our Constitution, could not close judicial

determination as to the real character of any law by
saying that such law was "necessary for the immediate
preservation of the public peace, health or safety" of
the State. We further said that this court could examine
the face of the legislative act, and if in fact it was not
for "the *immediate* preservation of the public peace,
health or safety" of the State, we could and would de-
clare the legislative declaration to the effect that it was
"necessary for the immediate preservation of the public
peace, health or safety" of the State, void, and of no
effect, as being in conflict with said constitutional provi-
sion, and the spirit thereof. We shall not reargue this
naked principle of law which our brother has adopted
as his views. Nor would we write at all in this case,
but for the fact that our learned associate has not dis-
cussed the character of the legislative acts before as at
this time. He sets out an outline of them, and ordinarily
this would, or should suffice. In this record we find that
learned counsel for respondent insist   (1)   that we bor-
rowed our constitutional provision from Oregon, and are
bound by the construction which the Supreme Court of
that State placed upon it before our adoption, and (2)
that the laws here involved are in fact necessary for the
"immediate preservation of the peace, health or safety"
of Missouri. The questions are seriously presented and
should be seriously considered. In their order we shall
consider them, and such other contentions as may require
notice.

I. It has been suggested that the views of the writer,
expressed in Paragraph Five of the opinion in State ex
rel. Westhues v. Sullivan, 283 Mo. l. c. 584, was *obiter* and

**Obiter.** was only interesting "in view of the fact that the
question might arise *in futuro.*" It is true that a
majority of my brothers were of opinion that such case
was decided before reaching that question, but counsel, on
both sides, conceived the question to be thoroughly in the
case, and on that theory briefed and vehemently argued
it. What was written was in response to that insistence,

and it was written after full investigation, not only of all the cases cited, but of all that could be found. It was written in exact coolness and deliberation, and far from a battle line, such as surrounds the instant case. But even *obiter* may express good law, and we think this alleged *obiter* does express the law, as well as the common sense of the question.

II.   The general rule is that where a statute or a constitutional provision is borrowed from another State, and has received a construction in the initial state by the highest court of that state, the presumption is that the borrowing state adopted it in the light of such construction. This, however, is only a rule of statutory construction, and the exceptions to the rule are as ancient as the rule itself. When we say "general rule" above, we mean that such is the frequent expressions of the courts. This court has often given similar expressions, where the question was under consideration. We have likewise given expression as to the exceptions. Nowhere are these exceptions more concisely stated than in 25 R. C. L. 1073, whereat it is said:

Adopted Constitutional Provision.

"The general rule just stated as to the construction of adopted statutes is by no means absolute, or imperative on the courts of the adopting state, but is subject to numerous exceptions. The rule that the adoption of a foreign statute carries with it the prior construction in the originating state has been held to be applicable only where the terms of the statute *are of doubtful import* so as to require construction. So the rule has been declared to be inapplicable where radical or material changes are made in the statute; where the statute had been materially changed by amendment, after the decisions construing it and before adoption; where the foreign construction is not in harmony with the constitution of the adopting state, or is contrary to the spirit and policy of the jurisprudence of the adopting state; *or where the courts of the adopting state are clearly of the opinion*

*that the foreign construction is erroneous, or that its application would lead to a denial of a substantial right.''*

To like effect is 36 Cyc. 1154-5: ''Where the Legislature enacts a provision taken from a statute of another state or country, in which the language of the act has received a settled construction, it is presumed to have intended that such provision should be understood and applied in accordance with that construction. This rule of construction, however, while recognized by all the courts, is subject to a number of limitations. The construction placed upon the statute by courts of the state from which it was adopted is regarded as persuasive, and indeed. as entitled to very great weight, with the courts of the adopting state, but not as conclusive; and it will not be applied where it would be inconsistent with the Constitution of the adopting state, or contrary to the spirit and policy of its laws, *or is regarded as unsound in principle and against the weight of authority.''*

In each of the foregoing quotations the italics are ours. Under the rule the court's interpretation to be considered is the interpretation given before the adoption. It could not be otherwise, because there could be no presumption that a given construction had been adopted, with the adoption of the statute, unless the construction preceded the adoption. The cases all so hold, and had to so hold by the very reason of the thing. In the early case of Pratt v. Miller, 109 Mo. 78, this court, through BRACE, J., found that we had borrowed an English statute, which had been previously construed in a given way—not once, but several times—before our adoption. This court refused to follow those constructions, because not consonant with the better reasoning of later cases. Some states do not recognize the rule at all, because a statute transplanted from one state system of laws to another state system of laws must be made to harmonize with the latter rather than the former. Many states hold that the previous construction is very persuasive, but not binding. The

cases can be gathered from the texts and notes thereunder which we have cited, supra.

The exception to the rule uppermost in our mind is that expressed in the terms "or where the courts of the adopting state are clearly of the opinion that the foreign construction is erroneous, or that its application would lead to a denial of a substantial right." The Kadderly case from Oregon does not announce sound doctrine. The Washington court repudiated it, and their constitutional provision was not adopted until four years after ours, aind long after the Kadderly case. Our Constitution provides both for a legislative referendum, and a referendum by the people. It is absolutely against all reason to rule that the Legislature can, by trick and chicanery, through a declaration against the very face of the bill, cut the people off from the constitutional rights to refer all measures, and yet retain the legislative right. In what we ruled in Sullivan's case we had in mind all rules of statutory construction, as well as all exceptions to such rules. We have recognized the exceptions before (109 Mo. 78, supra) and but exercise the same privilege in that case. As said there, to hold that the Legislature could by the use of a declaration to the effect that the given bill was "necessary for the immediate peace, health or safety" of the State, when in fact the bill itself showed no emergency would be to destroy the constitutional provision. Neither court nor Legislature should so construe a Constitution as to make it self-destructive. But after all, the section of the bill making this declaration of great emergency must be construed with all the other provisions of the bill, and if when so construed by a court, it fails to measure up to the spirit of the Constitution, it must fail. We said enough in Sullivan's Case, and will not further reiterate.

III. Of these bills, which change in a way the system of justices courts in Jackson County, and cut down the number of such courts, and the number of the consta-

bles thereof, it is urged that they really go to the *im-mediate* preservation of the peace, health and safety of the great State of Missouri.  Courts are not supposed to be blinded bats.  Of current history courts take judicial knowledge.  What all know, the courts must judicially know.  The current history shows the real purpose of these laws, and we need not state that history.  It is known to every member of the Legislature, every judicial officer of the State, and every lawyer and citizen, who has read and kept abreast with the current history, made and now being made.  To say that the purpose of these bills was to protect Missouri in some great, impending emergency relative to her peace, health or safety, is not only in the face of the bills themselves, but in the face of what her citizens know.  We need not go further.  *James T. Blair, C. J.,* and *Walker, J.,* concur.

JAMES T. BLAIR, C. J. (concurring).—Section 57 of Article IV of the Constitution provides, among other things:

"The legislative authority of the State shall be vested in a legislative assembly, consisting of a senate and house of representatives, but the people reserve to themselves power to propose laws and amendments to the Constitution, and to enact or reject the same at the polls, independent of the legislative assembly, and also reserve the power at their own option to approve or reject at the polls any act of the legislative assembly.  The first power reserved by the people is the initiative. . . . The second power is the referendum, and it may be ordered (except as to laws necessary for the immediate preservation of the public peace, health or safety and laws making appropriations for the current expenses of the state government, for the maintenance of the state institutions and for the support of the public schools) either" by petitions, etc.

At its regular session in 1921 the General Assembly passed certain acts which were intended to make changes in the system of justice of the peace courts in Kansas

City. Appended to one or more of these acts is the following: "*Emergency.*—This enactment is hereby declared to be necessary for the immediate preservation of the public peace, health and safety within the meaning of Section 57, Article 4, of the Constitution of Missouri." No emergency clause under Section 36 of Article 4 was attached or passed, but the principal bill contains a clause to the effect that it "shall become effective" July 1, 1921. Properly drawn petitions for the reference of these, signed by the requisite number of voters who possess the required qualifications, have been tendered to respondent for filing. He refused to file them because of the inclusion in the acts of the section which has been set out. This suit is brought to compel the filing of the petitions and the reference of the acts.

I. It is urged that the inclusion in the acts of the clause that the "enactment is hereby declared to be necessary for the immediate preservation of the public peace, health and safety" is conclusive upon the question of fact whether the act is so necessary. Upon this question much has been said in the briefs, and in opinions prepared by my brethren, and much can be found in the decisions they cite. Both sides of the argument are presented with vigor and learning. There is little that can be added. A few rather general observations may not be out of place.

Legislative Finding.

(1) In the circumstances the remarks of a learned annotator can properly be given place so that a general view of the question may be had at the outset. In the copious note to the decision in Hockett v. Licensing Board, 91 Ohio St. 176, 110 N. E. 485, which is found in 1917 B., L. R. A. (N. S.), at page 15 there appears (pp. 27-28) the following:

General View.

"According to the other line of authorities the legislative determination is not conclusive. The latter conclusion, that the legislative determination to declare an

emergency is not final, seems to be the correct one. The limitation upon the power of the Legislature to declare an emergency that only laws of a certain class shall be so subject, or that all laws except the class shall be subject to the referendum, without expressly vesting in the Legislature power to determine what laws come within that class, leaves to the courts the power to determine the question. In other words, a law must be a law belonging to the excepted class before it can be declared free from the referendum. Where the law is of the prescribed character the legislative determination that it shall be free from the referendum is final; but its determination that the law belongs to the excepted class is not. In support of this theory it has been pointed out that the clause excepting the named laws from the referendum is not the usual general emergency provision, but an exception to the otherwise universal application of the reserved power of referendum; that the clear purpose of the exception is to preserve unimpaired the right of the Legislature to exercise the police power so far as it may be emergent; that the exception from the referendum includes only those certain, definite and unquestioned phases of the police power which, in their very nature, may be and usually are emergent. It is further stated, that, as the court exercises jurisdiction to determine whether an act of the Legislature is a valid exercise of the police power, it must be a judicial question whether the exercise by the Legislature of certain phrases of that power which are selected and made an exception to the constitutional guaranty of the referendum is a valid exercise of the power.''

(2) Section 57 of Article IV of the Constitution does not provide that an act of the Legislative Assembly shall be exempt from the referendum if the Assembly shall declare it to be ''necessary for the imme-

Finality of Legislative Finding.

diate preservation of the public peace, health or safety.'' On the contrary, the exemption is made to depend upon the *fact* that the act *is* so necessary. This, of course, is not and cannot be

State ex rel. Pollock v. Becker.

disputed.   The argument is not that the Constitution provides in terms that the legislative finding shall be conclusive.   The argument is, in substance, that the effect of such a legislative finding of fact is final and conclusive on the courts in the very nature of the case.

(3)   If respondent is right in the position he takes on this question, i. e., that the inclusion of the peace, health and safety clause in the acts now in question, is conclusive on the question of fact whether the acts are necessary for the immediate preservation of the public peace, health and safety and bars all investiga-
All Acts
or None.
tion of that question by the courts, it cannot be denied that the same thing must be true as to all acts in which that clause has been or may hereafter be included.   If it is final as to one, it must be so as to all.   Neither the language of Section 57, nor the character of the rule contended for, will admit of a classification of legislative acts with respect to the question of the finality of the legislative finding upon the question of exemptability from the referendum on the ground of necessity for the immediate preservation of the public peace, health and safety.   It is final in the case of every act, or it is final, in the sense contended for by respondent, with respect to none.   This does not seem to be denied.

(4)   If, as just pointed out, respondent's proposition must be true as to all acts in which the peace, health or safety clause is incorporated, if true as to any, then it is proper in the light of this, to examine the result of upholding respondent's contention.   If the peace, health or safety clause can be employed by a majority
Police
Power.
of the Legislative Assembly to exempt all acts (not otherwise exempted) from the referendum, then it may be employed to exempt laws passed in the exercise of the police power or pursuant to an attempt to exercise that power.   The question is approached from this angle in order to avoid an apparent conflict of authorty upon the question whether the peace, health or safety clause is designed solely to exempt from the referendum

emergent exercise of the police power or whether it is broader than that. For the purposes of what is now to be written it makes no difference which contention is sound.

The police power aims directly to promote the "public welfare, and it does so by restraint and compulsion." These are said by Mr. Freund in his work on Police Power, Section 3, to be the "two main attributes or characteristics which differentiate the police power." It is well settled that the police power has its limitations. Generally, it is limited in its exercise to the enforcement of the maxim, "*Sic utere tuo ut alienum non laedas.*" [Tiedeman on Limitations of Police Powers, sec. 85, pp. 196-197.] For instance "in the exercise of the police power, personal liberty can be subjected to only such restraint as may be necessary to prevent damage to others or to the public." [Ibid.] According to the same author it is also well established that while the exercise of a particular calling may be regulated or prohibited if it threatens damage to the public or other individuals, and while the Legislature has a discretion to impose regulations when a proper case arises, it is nevertheless "strictly a judicial question whether the trade or calling is of such a nature as to require or justify police regulations. The Legislature cannot declare a certain employment to be injurious to the public good, and prohibit it, when as a matter of fact, it is a harmless occupation." The learned author quotes with approval from Beebe v. State, 26 Ind. 501: "The position, however, is taken on the part of the State, that it is competent for the Legislature, whenever it shall deem proper, to declare the existence of any property and pursuit deemed injurious to the public, nuisances, and to destroy and prohibit them as such; and that such action is not subject to be reviewed by the courts. We deny this proposition. We deny that the Legislature can enlarge its power over property or pursuits by declaring them nuisances, or by enacting a definition of a nuisance that will cover them. Whatever it has the right by the Con-

stitution to prohibit or confiscate, it may thus deal with, without first declaring the matter to be a nuisance; and whatever it has not a right by the Constitution to prohibit and confiscate, it cannot thus deal with, though it first declare it to be a nuisance.'' It is also pointed out that it is a judicial question whether a police regulation "extends beyond the threatened evil." For instance, the author says, in substance, a regulation which would attempt to go further than to exclude ignorant and dishonest men from the medical profession would be invalid, though a broad discretion may be used in the choice of means to accomplish that purpose. The point is that the power to restrain and compel under guise of the exercise of the police power is not unlimited. It must not overrun constitutional prohibitions or infringe constitutional rights. It can impose only such restraints as in fact bear some relation to the public good, in a general sense. A calling which involves the public health may be regulated (State v. Smith, 233 Mo. l. c. 267), but its free exercise cannot be hampered with burdensome restrictions and regulations which do not in any sense have in them anything tending to remove an actual, or ward off an apprehended evil to the public, and the like. [Freund on Police Power, sec. 492, p. 531.] In this connection in this State, as well as elsewhere, "The question presented where the validity of such laws is called in question is no longer the power or authority of the Legislature to enact them " (i. e., regulations affecting a calling which touches the public health) "but whether the occupation, calling or business sought to be regulated is one involving the public health and interests." [Ex parte Lucas, 160 Mo. l. c. 232, quoted in State v. Smith, supra.] This is the rule not only in Missouri, but generally. If this means anything it means that it is a judicial question whether the calling upon which the regulation is imposed is, as a matter of fact one which "touches the public health." This is one instance and there are many others of like character. The authorities are in accord, generally speaking, upon

289 Mo.—44

the proposition that the question of fact whether a trade or calling is of such a nature as to render it subject to regulations or to particular regulations, under the police power, is strictly a judicial question. This has not yet been denied in this case. It therefore appears that there are acts which, upon the question of their validity, present to the court questions of fact. There are, in fact, many such acts. When such an act is presented and the court finds that the calling is not such that it touches the public good in such a way as to justify regulation or the particular regulation attempted, this court and all courts hold such attempted regulations invalid. This is done in the face of the fact that the very enactment of the regulatory act involves a legislative finding that existing facts justify the regulation.

The purpose of what has been said is not to attempt to define the police power and cite all cases which come within it or announce any comprehensive rule concerning it, but to show that there are instances in which questions of fact are presented to and determined by the courts and in which the implied finding of fact by the Legislature has no binding or conclusive force.

(5) Let us suppose the General Assembly, prior to the adoption of Section 57 of Article IV, had included in a regulatory act, which depended upon the police power for its vaildity, an express finding that a calling was subject to regulation under the police power and that the particular regulation enacted was necessary to secure the public peace, health or safety. Would this have bound the courts upon the question of fact which they would otherwise have determined for themselves and have thereby rendered valid a regulation which otherwise would have been invalid? Would the courts then have been compelled to uphold the regulation, though neither the calling nor the regulation imposed in any way touched the public welfare in such sense as to bring such calling or regulation within the police power? To these questions the authorities cited above return negative answers.

Police Power Prior to Section 57.

If the answers are to be in the affirmative then by including in an act an express declaration, for instance, that a calling touched the public health and that the regulation prescribed protected the public health, the legislatures have always had the power to widen and enlarge the police power and bind courts on questions of fact with respect to which text-writers and courts agree they are not bound by the finding implied in every regulatory act which is passed, and thus evade most of the limitations on the police power found in the general language of constitutions. It will hardly be claimed this could have been done prior to the adoption of Section 57 of Article IV. It is not necessary to discuss at length the character of the presumption of validity which attends legislative enactments. It is enough for this phase of the case that it is settled that such presumption is not conclusive.

(6)   With the law in this condition and the police power so limited by provisions in both State and Federal constitutions, Section 57 of Article IV was adopted. If respondent is correct, that section exempts from the referendum every legislative act in which the Assembly includes a finding that such act is necessary for the immediate preservation of the public peace, health or safety. With respect to restraints upon callings, which classes of acts have been selected to illustrate the argument, the finding that they are necessary for the immediate preservation of the public peace, health or safety is necessarily a finding that the calling "touches" the public peace, health or safety. In other words, it is a finding upon the exact question of fact which heretofore has been held to be a question for the courts when they came to the question of validity of regulations under the police power. If the inclusion of the peace, health and safety clause in an act is, as respondent contends, conclusive upon the courts, then the result is that Section 57 empowers the Legislative Assembly to widen and extend the police power to include callings and regulations to which it could not have been

*Widening Police Power*

extended prior to the adoption of Section 57, and this by the simple use of a form of words in acts it passed without regard to the character of the regulation and despite the fact that the regulation is concededly unconstitutional had not the peace, health and safety clause been included in the act imposing it. It would enable the Legislative Assembly to remove from the realm of judicial questions every question of fact such as that referred to in the quotation in Ex parte Lucas, supra, and thereby largely revolutionize the law concerning the scope and extent of the police power by virtue merely of a phrase which declares that to be true which is untrue. If this marked change in the law was intended to follow the adoption of Section 57, is it unreasonable to think that the section would have been couched in language which would have at least given some hint of it? In the same article of the Constitution of which Section 57 became a part upon its adoption, appears Section 36, which pertains to the emergency clause required to put an act of the Legislative Assembly into immediate operation. This section expressly provides that the declaration of an emergency shall be put into the act intended to be put into immediate force thereby. The effect of this clause has, so far as is discovered, never been doubted. The language of Section 36 is markedly different from that of Section 57. Is it likely, that with an intent that Section 57 should, in effect, so far as the question here is concerned, have the same absolute force as Section 36, that those who framed and adopted Section 57 would have so carefully abstained from the use of a formula at hand in the very instrument they were amending, which formula would have accomplished, so far as legally possible, the purpose they had in view? Is not the avoidance of the approved formula particularly significant in view of the rather revoluntary effect of their intent if it was that which respondent ascribes to them? The difference between the words used in these two sections is wide and is inexplicable if respondent is right in his present contention.

Further, the purpose of the referendum is to "reserve to the people" the power to pass upon acts of the Legislative Assembly. That reservation is founded upon a belief that acts might be passed which would not be for the public good. In a sense it evidences a disbelief in legislative omniscience. Is it reasonable to think the people meant to reserve to themselves the power to refer acts of the Legislative Assembly because they feared that body might err in its enactments and then intended to confer upon a bare majority of the same Assembly, whose errors the referendum was designed to correct, full power to defeat any and all references of any and every bill by the simple inclusion in such bills of a set form of words, even though these words, so used, were false on their face? It will not do to say the people would have their remedy at the polls and could punish legislators by defeating them. This was true before there was a referendum section proposed and adopted. The remedy by referendum was added to that available at the polls.

Legislatures, like courts, sometimes err. The referendum has been thought designed to correct legislative errors. If respondent's position is tenable, then if the Legislative Assembly shall err and pass a bad law (in the belief that it is a good law) the error in passing this bad law is not subject to the referendum, but is exempt from such correction upon condition only that the same Legislative Assembly shall commit one more error, i. e., find as a fact that the law is necessary for the immediate preservation of the public peace, health or safety and then put this erroneous finding into the bad law. Does one error plus one error equal no error for the purposes of this case?

To ascribe such an intent to the people is to charge them with incorporating a remarkable absurdity in the organic law of the State. If the people desired that the same body whose enactments they wished to supervise by means of the referendum should have full power to prevent such supervision in every case, it seems reasonable to think they would have said so and, particularly,

would not have avoided so carefully a form of words already in the Constitution which would have been adequate to have effectuated this remarkable purpose.

(7)   Further, if the section means that the people intended to bind the State courts with respect to the question of fact whether an act is necessary for the immediate preservation of the public peace, health or safety, what did they intend concerning the same finding when a case was presented to the Federal courts in which the validity of a police regulation was challenged because it in no wise affected or touched the public good but was merely an arbitrary restraint? Will respondent contend that the power of the courts of the United States to wipe out arbitrary and excessive impositions and restraints on a finding of their own that they are so (McLean v. Arkansas, 211 U. S. 530) is defeated by such a finding as the Legislative Assembly has incorporated in the acts before us? Unless he so contends, what is there in the language of Section 57 which indicates an intent in the State jurisdiction which was not designed to apply to the Federal jurisdiction? The question suggested is not whether the respondent's construction of Section 57 could not stand as to the State courts even though it should be denied by the Federal courts. What is being examined is the question as to the intent of the people in adopting Section 57. The language of that section is quite general. On its face it applies to all cases in all courts. Ought it be given a construction which would clearly make it unconstitutional in some respects, when there is a more natural construction which gives effect to all of it? If it be conceded the legislative finding is not conclusive when an act is assailed as an invalid attempt to extend the police power beyond restrictions imposed by some of the provisions of the Federal Constitution, it is thereby conceded that some cases fall outside the rule for which respondent contends. But, as already pointed out, that rule, in its very nature, applies to all acts or none.

*Binding on State and Federal Courts Alike.*

(8) It might be argued that the legislative finding is conclusive upon the question whether an act is exempt from the referendum, but not conclusive on the same question of fact when the courts shall be called upon to consider the validity of the same act. It Conclusiveness is but fair to respondent to say he Upon Referendum and Courts. advances no such argument. He does not deny that an act, to be exempted from the referendum, must in fact be necessary for the immediate preservation of the public peace, health or safety—as Section 57 provides. What he contends is that when the Legislative Assembly puts the peace, health and safety clause into an act it thereby conclusively determines that fact to be true and no court or person can be heard to deny the truth of that finding. So far as his argument is concerned, we do not understand him to suggest the distinction referred to in the first sentence of this paragraph. We think that in refraining from doing so he exhibited sound judgment. If, when applied to an act of the class selected above to illustrate the case, the Legislative Assembly has found the act to be necessary for the immediate preservation of the public health, for instance, and if that finding necessarily includes a finding that the calling regulated "touches the public health," and if that finding binds the courts with respect to the matter of exempting the act from the referendum, it is difficult to see how it could be held that the people, in adopting Section 57, intended that the conclusiveness of the same finding could be evaded when the validity of the same act was drawn in question in the courts. It is the same act or law and it is the same finding. It is a finding that a particular fact in fact exists. It is not a finding that the Legislative Assembly is of opinion that the fact exists, nor a finding that it exists solely with reference to the power to exempt the act from the referendum. Section 57 requires the fact of necessity actually to exist before the exemptive power arises. The finding is that it does in fact exist. There is nothing in Section 57 which suggests that whatever finding, if any, is author-

·ized, is one thing for one purpose and another thing for another purpose. Such an intent would have been well expressed by words which would have vested directly in the Legislative Assembly power to declare the act exempt from the referendum whenever it thought proper to do so. No such words are found in the section. Did the people intend that the court should hold the same finding of fact conclusive, in one breath, and inconclusive in the next? Unless they did so intend the argument first adverted to constitutes no obstacle to the application of what has been said in preceding paragraphs. An easily conceivable result of the acceptance of the argument as true would be, that with respect to the same act, the same court would be compelled to hold the act was not referable because (being bound by the legislative finding) in truth and fact the act was within the police power, and subsequently compelled to hold that the act was not within the police power because the fact found by the Legislative Assembly was not a fact at all. Ought the people to be convicted of perpetrating such an absurdity unless they have made their intent to do so very clear? It is quite clear from the language they used that they intended nothing of the kind. The ease with which a purpose to permit the reference of laws to be defeated by a legislative declaration of something which might or might not be true could have been made evident and the careful avoidance of any expression which would evidence such a purpose are worthy of consideration in this connection. We decline to hold that those who framed and adopted this amendment did not mean what they said, but meant something which is excluded by what was said.

II. State ex rel. v. Hackman, 275 Mo. l. c. 646, and Ex Parte Renfrow, 112 Mo. l. c. 594, are cited as supporting the proposition that the finding of the Legislative Assembly is conclusive. It will hardly be contended these decisions hold that a legislative finding such as those discussed in the preceding paragraphs with respect to the applicability of the

Cases Distinguished.

police power to particular callings or activities, is final. Those cases did not involve that question. This sufficiently distinguishes them so far as concerns what appears herein.

III.   The contention that the acts in question are in fact necessary for the immediate preservation of the public peace, health or safety is sufficiently considered in other opinions in this case. The argument that the courts would be without means to determine the question of fact alluded to, in case it be held that it is open to them to pass upon it, is made. No greater difficulty would be likely to be presented than those presented when the courts do pass upon questions of fact in determining whether police regulations are valid or invalid.

*Question of Fact.*

IV.   The effect of the Oregon construction prior to our adoption is also well disposed of in other opinions in the case. The question upon which we followed such a construction in the case of State ex rel. v. Sullivan, was one which fell within the general rule. Upon such a question, one within the general rule, it is immaterial whether it is said that it is very persuasive, or that the adopting State is presumed to have adopted it, or that the courts of the adopting State are bound by it. In either case, on a question within the general rule, the previous construction is adopted. The question in this case falls within several exceptions to the general rule. This is too clear to require argument and other opinions in the case make that fact plain. The insistence that the rule in the Kadderly case must be adopted in this case, because it preceded our adoption of Section 57, assumes that the question in this case falls within the general rule upon the subject of the adoption of previous constructions and that it does not fall within any of the exceptions thereto. That this assumption is contrary to the fact will be apparent from a reading of the rule and of the exceptions to it.

*Foreign Construction: Exception.*

The rule and its exceptions are discussed in one or more concurring opinions and can be found there.

For these reasons and others given in other opinions filed the alternative writ should be made peremptory. *Walker* and *Graves, JJ.,* concur.

WALKER, J. (concurring).—The question here seeking solution is of grave importance. It involves the right of the people under the Constitution to enter into and become a part of the law-making power of the State. Correctly determined it cannot but tend to preserve and perpetuate that right; incorrectly determined, to destroy it.

The principal opinion by WOODSON, J., states in detail the facts upon which this controversy is based. However, a synopsis of same may not be inappropriate, if for nothing more than convenience of reference. The Fifty-first General Assembly repealed four laws concerning justices of the peace, their clerks and constables in certain municipal townships, and enacted other statutes relating to the same subjects in lieu thereof. To each there was appended this provision:

"This enactment is hereby declared to be necessary for the immediate preservation of the public peace, health and safety within the meaning of Section 57, Article IV, of the Constitution of Missouri."

Despite these provisions referendum petitions were circulated and having been signed by the required number of legal voters, regarding which there seems to be no question, they were presented to the Secretary of State for filing. He refused to file them, basing his refusal on the provision attached to each above quoted. The proceeding at bar was thereupon invoked to compel affirmative action on the part of the Secretary of State.

I. It was declared by this court in State ex rel. Kemper v. Carter, 257 Mo. 1. c. 70, that we adopted our constitutional provision in regard to the initiative and referendum from the Oregon Constitution. The Supreme

State ex rel. Pollock v. Becker.

**Foreign Construction.** Court of that state in constructing that portion of its constitution held in Kadderly v. City of Portland, 44 Ore. 118, 74 Pac. 1. c. 720, that whether a law is excepted from the referendum which declares that it is for the preservation of the public peace, health and safety is a question for the Legislature. In other words, that the Legislature may arbitrarily declare any act as for that purpose, and thereby prevent its reference to the people for approval or rejection. It is to be determined therefore whether this rule is to be followed in construing the adopted provision in our own Constitution.

It may be admitted that it is a general rule when a statute or a constitutional provision has been adopted from another state that the construction here placed upon it by the highest court accompanies it and is treated as incorporated therein. This rule, however, is not absolute. [Whitney v. Fox, 166 U. S. 637; Coulam v. Doull, 133 U. S. 216.] If so, it would result not infrequently in so limiting the exercise of judicial discretion as to result in thwarting the will of the people as expressed in the constitutional provision. The arbitrary application of this rule was never intended, and cases are not wanting which demonstrate that it is subject to numerous exceptions. Especially is this true where, as in this case the foreign construction is not in harmony with the spirit and purpose of our Constitution as declared in the provision sanctioning the initiative and referendum. [Sec. 57, Art. 4, Con. Mo.; Bowers v. Smith, 111 Mo. 52; Hutchinson v. Krueger, 34 Okla. 23, Ann. Cas. 1914-C, 98, 41 L. R. A. (N. S.) 315; Western Terra Cotta Co. v. Board Education, 39 Okla. 716; Boyd v. C. L. Ritter L. Co. (Va.), 89 S. E. 273.] Furthermore, it is held in a large number of cases that a construction of a statute by the courts of the originating state will not be followed by the courts of the adopting state, if they are clearly of the opinion that it is erroneous, and will result in the denial of a substantial right. [Deer Lodge Co. v. U. S. Fidelity Co., 42 Mont. 315, Ann. Cas. 1912-A, 1010; State v. Campbell, 73 Kan. 688, 9 Ann.

Cas. 1203, 9 L. R. A. (N. S.) 533; Torrance v. Edwards, 99 Atl. (N. J.) 136; Penn Br. Co. v. N. C., 222 Fed. 737, 138 C. C. A. 191; Gr. West Sugar Co. v. Gilcrest Lbr. Co., 25 Colo. App. 1; Rhoads v. Chicago Co., 227 Ill. 328, 10 Ann. Cas. 111, 11 L. R. A. (N. S.) 623; People v. Griffith, 245 Ill. 532; Moore v. O'Leary, 180 Mich. 268; Dow v. Simpson, 17 N. M. 357; Pierson v. Minnehaha Co., 26 S. D. 463, Ann. Cas. 1913-B, 386; State ex rel. Brislawn v. Meath, 84 Wash. 302, 147 Pac. 11.] In Pierson v. Minnehaha County, supra, the court said: "This court should not, under any circumstances be found or required to follow what it deems to be an erroneous construction placed upon a foreign statute, by a foreign court, any more than we should be required to follow an erroneous decision of our own court."

In State ex rel. Brislawn v. Meath, supra, the Supreme Court of Washington, in discussing the arbitrary rule announced in Kadderly v. Portland, supra, pertinently said: "The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the Legislature has transcended the limits of its authority. If, therefore, a statute, purporting to have been adopted to promote the public health, the public morals, or the public safety, has no real or substantial relation to these objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution."

In Hutchinson v. Krueger, supra, this question was given exhaustive consideration. Quoting from State v. Campbell, supra, the Supreme Court of Oklahoma says: "We recognize the force of the rule that where one state adopts a statute from another state it adopts the construction placed thereon by the courts of that state; but this is a general rule to which there are numerous exceptions. It is not an absolute rule."

In Dixon v. Ricketts, 26 Utah, 215, it was said: "It is a general, though not a binding, rule of statutory construction that where the provisions of a statute have received judicial construction in one state, and it is then adopted in another state, it is adopted with the construction so given it." Further quoting from Endlich on Statutes, sec. 371, the court says:

" 'Whilst admitting that the construction put upon statutes by the courts of the state from which they are borrowed is entitled to respectful consideration, and that only strong reasons will warrant a departure from it, its binding force has been wholly denied, and it has been asserted that a statute of the kind in question stands upon the same footing, and is subject to the same rules of interpretation, as any other legislative enactment. And it is manifest that the imported construction should prevail only so far as it is in harmony with the spirit and policy of the general legislation of the home state, and should not, if the language of the act is fairly susceptible of another interpretation, be permitted to antagonize other laws in force in the latter or to conflict with its settled practice.' "

In Coad v. Cowhick, 9 Wyo. 316, 87 Am. St. 953, the court, construing a statute adopted from Ohio, refused to follow a decision of the latter court, holding a judgment not a lien upon after-acquired lands of the judgment debtor. The reasons stated by the Wyoming court were that the statute under consideration was not peculiar to Ohio, as other states had similar provisions, using the identical words, or language the same in substance, and because it considered the decision of the Ohio court to be opposed to the best reasoning and the weight of authority.

In Ancient Order v. Sparrow, 29 Mont. 132, 1 Ann. Cas. 144, the Supreme Court of that state in construing a statute adopted from California, said: "This court will not blindly follow the construction given a particular statute by the court from which we borrowed it, when the decision does not appeal to us as founded on right reasoning."

The limitation placed upon the rule by this court is that the construction given by the courts of a state to a statute will be given respectful consideration by the courts where such statute has been adopted. We said thus much, no more, in the Carter Case, 257 Mo. 70.

In State v. Campbell, 73 Kan. 688, 9 L. R. A. (N. S.) 533, the Supreme Court of that state in construing a statute adopted from Missouri said in effect: ''To regard ourselves as absolutely bound by the construction given to this statute by the Supreme Court of Missouri would give it greater weight than if it had been construed orginally by our own court, in which case the right and duty of this court to disregard its former ruling would not be denied, if, upon reexamination, it should be found opposed to the better reasoning, in conflict with the great weight of authority or not in harmony with the spirit and policy of our laws.''

From these cases and others of like import it will be seen that the arbitrary application of the rule in the construction of adopted statutes accords neither with reason nor precedent. The most conservative statement of its application is to be found in our later Missouri cases, in which it is said in effect that when a law is adopted by the Legislature of this State the construction placed upon it by courts of the state of its origin will be presumed to have met with the approval of the Legislature when adopting it. [Knight v. Rawlings, 205 Mo. 412; State ex rel. Guion v. Miles, 210 Mo. 127; State ex rel. v. Carter, supra.] Thus expressed the rule loses its arbitrary application and becomes as it should be, persuasive, in that if the former construction of an adopted law is found to be reasonable and in harmony with the spirit and purpose which promoted its adoption, a like construction will be given to it here. Otherwise, not.

II. It becomes pertinent, therefore, to inquire as to the spirit and purpose of the people in incorporating the initiative and referendum into our Constitution. For reasons not necessary to be enumerated here, but of suffi-

State ex rel. Pollock v. Becker.

cient impelling power to prompt action, at the time, it
was determined to provide an efficient method
Interest of Referendum. for the checking and regulating of legislative
power. This determination found expression
and was given operative force in the adoption of the initi-
ative and referendum. We are concerned here more par-
ticularly with the latter. It may be ordered, says in effect
our organic law (Secs. 57, Art. IV), in regard to all mat-
ters of legislation, except laws necessary for the im-
mediate preservation of the public peace, health or safety,
appropriations of current expenses of the State govern-
ment, the maintenance of State institutions and the sup-
port of public schools. Comprehensive in its terms and
definite in its exceptions, it requires, as Hudibras would
have it, "neither gloss or comment but may be unriddled
in a moment." The case with which it may be interpre-
ted, however, must not lessen the force of the fact, which
was the moving impulse in the adoption of the amend-
ment, that the power thereby reserved is in the people and
that upon which it is to be exercised is the Legislature. In
other words, the Legislature, proposes and the people
dispose of its acts, either by approval or rejection as
they may deem proper, save as excepted in the Constitu-
tion. Despite this unequivocal declaration of power it is
contended by respondent, supported by the holding of the
Supreme Court of Oregon in the Kadderly case, supra,
that the Legislature may nevertheless determine, not
only the extent to which this power may be exercised, but
whether it may be exercised at all. This holding vio-
lates the spirit and destroys the purpose of the amend-
ment. If the Legislature, as in the instant case, may
except from the referendum acts abolishing the offices of
justices of the peace, clerks and constables in a desig-
nated township and provide for the selection of their
successors by simply declaring that such acts are for
the immediate preservation of the peace, health and
safety, then a like exception may be effected by append-
ing this provision to any other act, regardless of the ab-
surdity of its application and thus the constitutional

power intended to be reserved will there by be completely destroyed.

A blind following of the rule of construction, we have discussed, stripped of all of its exceptions, is the chief refuge sought to sustain the contention that the Legislature may, in this instance by the magic of misapplied words, restore to itself a power reserved by the people to themselves. Construing the rule, however, in the light of the numerous exceptions noted and in harmony with the spirit manifested and the purpose intended to be accomplished in the adoption of the amendment, we avoid absurdities in the use of words otherwise unmistakable in their meaning, recognize without doing violence to same the limitations upon legislative power and, at the same time do not minimize that reserve to the people.

III. There is a familiar maxim, uniform in its application, that the reason of the law is the life of the law, or as the pedants put it, *Ratio legis est anima legis.*

Absurdity.

By the reason of the law we mean, of course, the occasion or moving cause, of its enactment. This is the touch stone of correct interpretation. Which, says a learned judge, "if not sought and found by the courts, they miss their prime and most august function." [Dudley v. Clark, 255 Mo. l. c. 586.] Applying this maxim to the referendum provision, we found, without doing violence to either its words, context or subject matter, that the reason for its enactment was legislative regulation. Applying the maxim to the acts under review, will, therefore, enable it to be determined regardless of barren rules or arbitrary precedents, whether the incorporation therein of the provision that they are for the preservation of the public health, etc., renders them immune from reference or whether this provision is a mere legislative *brutum fulmen,* incongruous in its setting and hence inconsistent with the subject-matter of the acts.

Enough has been said to indicate the nature of the acts under review. By their terms they apply not to the justices' clerks and constables of the State or of a certain

class of counties, but to those of townships which have or may hereafter have a certain population. This precludes their general application, and at the same time enables them to escape the constitutional pruning knife under the thinly veiled mantle of classification. As a matter of fact, of which we may take judicial notice, their present application is limited to the municipal township in which Kansas City is located. Unless, therefore, we attribute to them the virtue of Prince Ahmend's tent which, at will, would cover an army or could be folded within the compass of its owner's pocket, we cannot classify these acts as of a general nature, such as was evidently contemplated by the Constitution in the use of the word "public" in the referendum.

To emphasize this conclusion, analysis of that portion of the excepting clause here under consideration is appropriate. It will be recalled that its wording, so far as is applicable here, is "except as to laws necessary for the immediate preservation of the public peace, health or safety." The word "preservation," say the lexicographers, presupposes a real or existing danger; and "immediate preservation from" is indicative of a present impelling necessity, with nothing intervening, to prevent the removal of the danger. By the "public peace" we mean that quiet, order and freedom from disturbance guaranteed by law. [Neuendorff v. Duryea, 6 Daly (N. Y.) 276, 52 How. (N. Y.) 269; Gribble v. Wilson, 101 Tenn. 612.]

Laws in regard to "public safety" are allied in their application and effect to those enacted to promote the public peace, preserve order and provide that security to the individual which comes from an observance of law. By the "public health" is meant the wholesome sanitary condition of the community at large. [1 Bl. Comm. 122; Anderson's Law Dic.]

The meaning of these controlling words in the excepting provision, concerning the correctness of which there can be no reasonable ground of controversy, furnishes no reason, except such as may exist in the exuber-

289 Mo.—45

ant fancy of their draftsman, for the incorporation of this provision in the acts here subjected to interpretation. To assert that either the public peace or health or safety was so menaced in the township designated as to call for the enactment of a statute in the exercise of the police power, is refuted by the language and evident purpose of the acts themselves. Read with an open mind, and an intelligent understanding of the words employed, and disregarding any esoteric meaning or purpose their enactment might imply, with which we have no concern here, their real object, or *raison d'etre*, to give it a Gallic flavor, was to effect a change in the personnel of the officers designated, as well as the laws defining their duties and prescribing their powers. Leaving the propriety of their enactment, and the wisdom of their terms, so far as concerns their legitimate subject-matter, out of the question, they disclose no tenable ground which will stand the test of interpretation for the incorporation therein of the provision by which it was sought to exempt them from the referendum. Plainly put, the incorporation of this appendant provision involves an absurdity the presence of which is sufficient under a well established rule of construction to authorize its rejection. It has no place or proper purpose in legislation of the character here being considered. Statutes are not to be construed so as to result in an absurdity. The provision should therefore be held to be superfluous. [Darlington Lbr. Co. v. Railroad, 216 Mo. 658; Perry v. Strawbridge, 209 Mo. 621; Johnston v. Ragan, 265 Mo. 420; Stack v. Genl. Bak. Co., 223 S. W. (Mo.) 89.]

IV. It may be conceded that every intendment should be made in favor of the propriety of legislative action. Notwithstanding this presumption, however, the courts have ever since the ruling by the Supreme Court of the United States, in Marbury v. Madison, 1 Cranch, 137, exercised the right to determine whether legislative enactments are violative of the Constitution. "It is," said the learned Chief Justice in that case, "emphatical-

ly the province and duty of the judicial department to say what the law is.'' More imperative is this duty under modern constitutions 'in which the lawmaking power is no longer exclusively the province of the Legislature, but is divided between it and the people themselves. Instead, therefore, of the judicial construction of statutes, as at bar, constituting an invasion of the legislative province, it amounts to nothing more than a determination by the court as to whether the Legislature has properly exercised its discretion in declaring these acts subject to the police power exception, or whether its declaration was unwarranted, and if sustained, will result in cutting off the people's reserve power to participate in legislation. If the constitutionality of an act was, therefore, a proper matter of judicial determination before the referendum amendment, it is none the less so since, because in its last analysis, a ruling as to the proper application of the exception in the acts is nothing more than a judicial determination of their validity under the organic law. If the exception has been properly incorporated in the acts, then they are valid; if improperly incorporated, then they are invalid so far as the exception is concerned. We said in State ex rel. Roach v. Halliburton, 230 Mo. 408, 139 Am. St. Rep. 639, that ''legislation is subject to existing constitutional restrictions.'' An apparent, much less a patent, violation of these restrictions will authorize judicial determination. Our power therefore is ample, to enable us to determine, as we do, free from any tenable charge of unwarranted invasion, that the legislative declaration as to the immunity of these acts from the referendum was unwarranted.

In harmony with the foregoing conclusions, and sustaining them by a carefully analyzed array of cases, is the opinion of the Supreme Court of Montana in State ex rel. Goodman v. Stewart, 187 Pac. 641, in which MATHEWS, J., speaking for that court, has discussed and determined with clearness and strength of conclusion almost every phase of the matter at issue. An epitome of

these relevant rulings is all that is permissible here. They are as follows: As to whether an act is necessary for the immediate preservation of the public peace, etc., and thus excepted from the referendum, is to be controlled by the nature of the act and not by a superfluous declaration of necessity incorporated therein; that the propriety of the incorporation of the exception in an act is a judicial question; that in determining same the utmost that can be considered in the face of the act, the history of the legislation, contemporaneous declarations of the Legislature, the evil to be remedied, and the natural or absurd consequences of any particular interpretation. From all of which the conclusion is authorized that if a statute purports to be for the preservation of the public peace, health, etc., and from its words and subject-matter it has no real or substantial relation to the act, or is a palpable invasion of rights reserved by the Constitution, it is the duty of the courts to so decide and thereby give effect to the fundamental law. [Mugler v. Kansas, 123 U. S. 623, 31 Law. Ed. 205.]

We therefore concur in the conclusion reached by Woodson, J., in the principal opinion. This concurring opinion has been deemed necessary on account of the writer's dissent in State ex rel. Westhues v. Sullivan, 283 Mo. 547, which, upon a careful review, has been found to be unwarranted. *James T. Blair, C. J.,* and *Graves, J.,* concur.

ELDER, J. (concurring).—While I concur in the recult of the opinion filed herein by my learned associate, Judge Woodson, I feel constrained to briefly express my individual views upon the question presented for determination.

As is provided in Section 57 of Article IV of the Constitution of this State, the second power reserved by the people is the referendum, and, in the language of the said section, "It may be ordered except as to laws necessary for the immediate preservation of the public peace, health or safety." The mandate of the

Constitution, coming directly from the people, is supe-
rior to the will of the Legislature.  As to who shall be
the judge of whether or not a law is ''necessary for the
immediate preservation of the public peace, health or
safety,'' the Constitution is silent,  True, the Legisla-
ture, being invested with the law-making power, must
in the first instance, be the judge of the necessity in a
given case, otherwise it could not act.  But, is that de-
termination, if in fact without substantial basis, final
and conclusive?  I think not.  The discretionary power
initially lodged in the legislative department of the gov-
ernment should not be abused but should always be
exercised in a manner consonant with the true intent of
the framers of the Constitution and of the people who
adopted it.  If, therefore, a statute purports to have
been adopted to meet an emergency which palpably,
from the face of the statute, does not exist, it becomes
the duty of the courts to take jurisdiction and give effect
to the constitutional intent and purpose.  In such tri-
bunal alone resides the power to determine whether or
not the act of the Legislature conflicts with the provi-
sions of the Constitution.  [Baily v. Gentry, 1 Mo.
164; Justices' Answers, 70 Me. 1. c. 599; People v. Raf-
ferty, 77 N. Y. Misc. 258; Cohens v. Virginia, 6 Wheat.
264; 6 R. C. L. 69.]

It has been ably suggested by my learned brother
HIGBEE that the Initiative and Referendum Amendment
under review was taken from the Constitution of Oregon
and that we are bound by the construction placed upon it
by the Supreme Court of that state, which court ruled
that the declaration of the Legislature upon the question
of necessity was conclusive.  While it may be conceded
that the general rule is as stated, nevertheless that rule
is not absolute or imperative and has its exceptions.
One of these exceptions is that where the courts of the
adopting state are of the opinion that the foreign con-
struction is erroneous, the borrowed law does not carry
with it the prior construction in the originating state.
[Ancient Order of Hibernians v. Sparrow, 29 Mont. 132;
State v. Campbell, 73 Kan. 688; Whitney v. Fox, 166

U. S. 637.]   While the interpretation put upon statutes or constitutional provisions by the state from which they were taken are persuasive and are entitled to respectful consideration, nevertheless that interpretation should be founded on right reasoning.  Because the Supreme Court of the State of Oregon may have ruled that the Legislature alone can determine whether or not an emergency exists, that ruling should not bind this court if, for instance, our Legislature should enact a law designating a certain flower as the official state flower and containing an emergency clause reciting that the measure was for the immediate preservation of the public peace, health and safety.  Would any one argue that such an absurd and arbitrary *dictum*, declaring such a law necessary for the immediate preservation of the public peace, health and safety, was rightfully intended to have the effect of withholding the right of referendum should an attempt be made to invoke it?  And yet such would be the consequence if the reasoning of the Supreme Court of Oregon is to be followed.  Such a doctrine would be totally destructive of the referendum, for, by the mere *ipse dixit* of the Legislature, without cause in truth or fact, any measure could be withheld from ratification or rejection by the people at the polls.

In the instant case, to say that the preservation of the public peace, health and safety demands the immediate abolition, in one certain township, of the offices of eight justices of the peace and constables (who from the record before us are to be presumed to be properly and efficiently discharging their respective duties), and the immediate appointment of new justices and constables, is asking us to go far afield from the true intent of the constitutional provision invoked by respondents.

Entertaining the views above indicated, I am of the opinion that the writ of mandamus should be made permanent.  *James T. Blair, C. J., Graves* and *Walker, JJ.,* concur.

HIGBEE, J. (dissenting).—I respectfully dissent from the opinion filed in this case by our learned brother

WOODSON. It is based solely upon the opinion of GRAVES, J., in State ex rel. Westhues v. Sullivan, 283 Mo. 547. That was an action instituted by the Prosecuting Attorney of Cole County against the Secretary of State and the Attorney-General of the State, restraining them from submitting the Workmen's Compensation Act under the Referendum Amendment, Section 57, Article IV, of the Constitution. All of the judges were agreed on certain points: (1) that the prosecuting attorney had no authority to bring the action to restrain the State officials; (2) the referendum petitions not having been filed in the office of the Secretary of State, the action was premature; (3) the emergency clause to the act sought to be referred did not declare that the measure "is necessary for the immediate preservation of the public peace, health or safety. . . . But, for our present purpose, it suffices to say that the emergency clause does not bring the measure within the excepted class named in the Constitution." [Page 334.] Judge GRAVES, however, proceeded in a learned and interesting opinion in view of the fact that the question might arise *in futuro*. Judge WOODSON concurred. Judge WALKER did not concur in the reasons or conclusion of Judge GRAVES. What the other judges said will be noted later in this opinion.

Judge GRAVES, at page 334, said: "As said by FARIS, J., in State ex rel. v. Carter, 257 Mo. l. c. 70, we borrowed our referendum provision from Oregon and borrowed it after the ruling in the Sears Case, supra."

The Initiative and Referendum Amendment was adopted in this State at the November election in 1908. It was taken almost literally from the Constitution of Oregon. [State ex rel. v. Carter, 257 Mo. 52, 68.] In the year 1904, the Supreme Court of Oregon, in Kadderly v. Portland, 44 Ore. 118, 75 Pac. 222, in passing on the question raised in this case, expressly ruled that the action of the Legislature declaring that an enactment is necessary for the immediate preservation of the public peace, health and safety, etc., is final and conclusive,

and cannot be questioned in any judicial proceeding. We quote in part from the opinion:

"The amendment excepts such laws as may be necessary for a certain purpose. The existence of such necessity is therefore a question of fact, and the authority to determine such fact must rest somewhere. The Constitution does not confer it on any tribunal. It must, therefore, necessarily reside with that department of the government which is called upon to exercise the power. It is a question of which the Legislature alone must be the judge, and when it decides the fact to exist, its action is final. [Briggs v. McBride, 17 Ore. 640, 21 Pac. 878, 5 L. R. A. 115; Umatilla Irrig. Co. v. Barnhart, 22 Ore. 389, 30 Pac. 37; Gentile v. State, 29 Ind. 409; Wheeler v. Chubbuck, 16 Ill. 361; Sutherland on Stat. Const. 108.] In this view we are supported by the Supreme Court of South Dakota. In 1898 an amendment to the constitution of that state was adopted by the people, similar in many respects to the amendment now under consideration; and, so far as the laws exempted from its operation are concerned, the language of the two amendments is identical. In State ex rel. v. Bacon, 14 S. D. 394, 404, 85 N. W. 225, the court say in referring to this amendment: 'It will be observed that the law of 1901 which we are considering not only declares that an emergency exists, but also that the "provision is necessary for the immediate preservation and support of the existing public institutions of this state." It seems to have been uniformly held under constitutions containing an emergency clause, and providing that laws containing such a clause shall take effect as therein directed, that the action of the Legislature, in inserting such a clause is conclusive upon the courts (citing authorities). No reason occurs to us why the same rule should not apply to the act in question. The Legislature having declared that the provisions of that act are necessary for the immediate preservation and support of the existing public institutions of the state, that declaration is conclusive upon this court, and brings this

class clearly within the exception contained in Section 1 [as amended] of Article 3 of the Constitution.'

"But, it is argued, what remedy will the people have if the Legislature, either intentionally or through mistake, declares falsely or erroneously that a given law is necessary for the purposes stated? The obvious answer is that the power has been vested in that body, and its decision can no more be questioned or reviewed than the decision of the highest court in a case over which it has jurisdiction. Nor should it be supposed that the Legislature will disregard its duty, or fail to observe the mandates of the Constitution. The courts have no more right to distrust the Legislature than it has to distrust the courts. The Constitution has wisely divided the government into three separate and distinct departments, and has provided that no person charged with official duties under one of these departments shall exercise any of the functions of another, except as in the Constitution expressly provided. [Const. Or., art. 3, sec. 1.] It is true that power of any kind may be abused when in unworthy hands. That, however, would not be a sufficient reason for one co-ordinate branch of the government to assign for attempting to limit the power and authority of another department. If either of the departments, in the exercise of the powers vested in it, should exercise them erroneously or wrongfully, the remedy is with the people, and must be found, as said by Mr. Justice STRAHAN in Briggs v. McBride, 17 Ore. 640, 5 L. R. A. 115, 21 Pac. 878, in the ballot box. We are of the opinion, therefore, that the findings and declarations of the Legislature that the Act of 1903 for the incorporation of the city of Portland was necessary for the immediate preservation of the public peace, health, and safety are conclusive on the courts, and consequently the charter was not subject to the referendum power, and was in force and effect from and after its approval."

When we adopted the Referendum Amendment from the Constitution of Oregon, we adopted the construction given it by the Supreme Court of that State as much

as if that construction had been written into the body of the amendment. [State ex rel. v. Carter, supra, l. c. 69; State ex rel. Guion v. Miles, 210 Mo. 127, 146.]

Judge JAMES T. BLAIR filed an opinion in the Sullivan Case in which WILLIAMS, GOODE and WILLIAMSON, JJ., concurred. It is as follows:—

"I concur in Paragraphs I, II and III. In Paragraph IV, I concur because we are bound by the construction given the Oregon Constitution by the Supreme Court of that State prior to our adoption of its provisions. With respect to Paragraph V, it is enough to say that the expressions in Section 81, therein referred to, do not indicate any intent to put the act in force under the public peace, health or safety clause of the referendum section of our Constitution. As to the 'broader question,' I express no opinion. It cannot be involved in this case. In the remaining paragraphs I concur."

So it appears that the propositions decided in that case are that the prosecuting attorney could not institute the proceedings against the State officials, that the action was premature, and that the act did not declare it was necessary for the immediate preservation of the public peace, health or safety, and there was no question before the court for determination. Nevertheless, Judge GRAVES proceeded to discuss a supposititious case. His rulings were clearly *obiter dicta*. Five of the judges disagreed with his conclusions. Four of the judges held that we are concluded by the interpretation given the act by the Supreme Court of Oregon. The decision is, therefore, a direct authority in favor of our contention that we adopted the Referendum Act with the construction given it by the Supreme Court of the State of its origin.

But it is said: Suppose the Legislature should declare a legal holiday and embody in the act the "peace, health or safety" clause. Would this court be concluded by the declaration? The answer is: We have no such case before us. The Constitution has solemnly

vested the legislative power of this State in the General
Assembly of the State of Missouri. That body is an
independent, co-ordinate department of our government,
answerable only to the people of the State for the ex-
ecution of the powers delegated to it by the Constitution.
Moreover the measure may be submitted to a direct vote
of the people by an initiative petition, so that there is no
foundation for the suggestion that the Legislature may,
by fraud or trickery, prevent legislation by the people.

As was well said in Oklahoma City v. Shields, 22
Ok. 265, 100 Pac. 559, l. c. 576:

"To determine, under a state Constitution, what can
be accomplished by general or special legislation, has
been, with but few exceptions, held to be a question sole-
ly for the Legislature. [Citing cases.]

"We conclude that the judgment of the Legisla-
ture in determining whether or not an emergency ex-
isted—that is, whether or not a measure is immediately
necessary for the preservation of the public peace,
health, or safety—rests solely with the Legislature. It
is not subject to review by the courts, or any other au-
thority except the people. Under the reserved power
of the initiative and referendum, after the declaration
of an emergency, when not referred to the people for
their judgment in such measure, it still remains with
the people, if they are dissatisfied with a measure, by an
initiative petition to cause the same to be submitted to
the people at the next general election for determination
as to whether or not such act shall be repealed."

In State v. Moore, 103 Ark. 48, 145 S. W. 199, l. c.
202, the court said:

"It was a question exclusively for legislative deter-
mination; and such determination alone could bring it
within this exception and power of the Legislature to
make it immediately effective, and thereby remove it
from the general class of laws upon which the people re-
served the right to order the referendum. [Stevens
v. Benson, supra; Kadderly v. Portland, 44 Or. 118, 74
Pac. 720; Sears v. Multnomah County, 49 Or. 42, 88

Pac. 522.]'' See, also, Van Kleek v. Ramer, 62 Colo. 4, 156 Pac. 1108.

"But it belongs to the political, and not to the judicial, department of the government to determine these interesting and important questions of civic policy, as its wisdom shall deem for the best interests of the people.'' [State ex rel. v. Bacon, 14 S. D. 394, 85 N. W. 225, 228.]

Being of the opinion reached by the majority of the court in the Sullivan case, supra, that we are concluded by the interpretation given to the Referendum Amendment in the Kadderly Case, and that we are without power to question the finding of the Legislature in the premises my conclusion is that the writ should be denied.

DAVID E. BLAIR, J. (dissenting).—I am unable to concur in the views expressed or the result reached in the opinion filed by my learned brother WOODSON.

In the first place the case of State ex rel. v. Sullivan, 283 Mo. 547, 224 S. W. 327, relied on as the sole authority for said opinion, does not even purport to decide the question involved in this case and the expression of opinion on the question here involved made in that case does not even rise to the dignified status of *obiter dicta*. In passing on the questions really involved in the Sullivan Case, supra, GRAVES, J., expressed as his view that the legislative declaration that an act passed by the General Assembly is necessary for the immediate preservation of the public peace, health and safety, is not binding on the Court and whether such act may be submitted to the people under the provisions of our Constitution in relation to the referendum is subject to judicial review and such declaration is not binding on the courts. WOODSON, J., concurred in those views. In that case the views as expressed were *obiter,* because no question of that sort was in the Sullivan Case. WALKER, C. J., expressly dissented to that view and WILLIAMSON, GOODE, BLAIR and WILLIAMS, JJ.,

made it very clear in their separate concurrence that they expressed no opinion on the question, because that question was not in that case for decision. That case is, therefore, utterly valueless as an authority in the case before us.

It is settled beyond any question that when one state borrows a statute or a constitutional provision from another state and the highest court in that state has authoritatively construed said statute or constitutional provision prior to its adoption in the second state, such statute or constitutional provision is held to have been adopted together with such construction by such highest court. [Skouten v. Wood, 57 Mo. 380; State ex rel. v. Miles, 210 Mo. l. c. 146; State ex rel. v. Sullivan, 224 S. W. 327.]

There appears to be no question that the referendum provision to our Constitution was borrowed from the State of Oregon. [See opinion of GRAVES, J., in State ex rel. v. Sullivan, 224 S. W. 327.]

In the case of Kadderly v. Portland, 44 Ore. 118, 75 Pac. 22, it was squarely decided by the Supreme Court of Oregon, on January 11, 1904, and more than four years before the referendum amendment was added to our Constitution, that the declaration of the Legislature that a given act is necessary for the immediate preservation of the public peace, health and safety is final and that such declaration is conclusive on the court. That construction was part of the provision when we borrowed it from the State of Oregon, and if not absolutely binding on this court is persuasive authority of the highest character.

In addition the highest courts of the States of Oklahoma, South Dakota, Arkansas and Colorado have ruled on very similar constitutional provisions as has a Supreme Court of Oregon.

While it is true the conclusion reached by my brother WOODSON is the same as that of the Supreme Courts of California, Washington and Michigan, I note that it is pointed out in respondent's brief as follows: "Out

of twelve cases determined by the various supreme courts, eight were decided by an undivided court; of these eight, six determined the question of final determination in favor of the Legislature, and two determined that question in favor of the courts. Of the cases determined by a divided court, two determined the question in favor of the Legislature and two in favor of the courts. Of the cases decided by a divided court twenty-eight judges gave their opinion on the question, fifteen deciding in favor of legislative determination and thirteen in favor of judicial determination. In the twelve courts passing on this question, sixty-eight judges participated, forty-three of whom decided the question in favor of the legislative determination and twenty-five in favor of judicial determination.'' Thus it is seen that the weight of authority is decidedly against the conclusion that this is a matter for determination by the court.

On principle and independent of the decided cases, I am of the opinion that the courts are and should be bound by the declaration of the Legislature, and for these reasons I dissent.